UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 2:11-cr-141-GZS |
| | ) | |
| ALEX MOUSTROUPHIS and | ) | |
| CHRISTOPHER HALE, | ) | |
| | ) | |
| Defendants | ) | |

### RECOMMENDED DECISION ON MOTIONS TO SUPPRESS

The defendants, Alex Moustrouphis and Christopher Hale, each charged with conspiracy to distribute and possession with intent to distribute cocaine base, in violation of 21 U.S.C. §§ 846 and 841(a)(1), and possession with intent to distribute cocaine base, in violation of 21 U.S.C. § 841(a)(1), Indictment (ECF No. 15) at 1-2, have moved separately to suppress certain evidence.

An evidentiary hearing was held before me on April 24, and May 9, 2012, at which the defendants appeared with counsel. The government tendered three witnesses and offered five exhibits, all of which were admitted without objection. The defendants called two witnesses and offered eight exhibits, which also were admitted without objection. A stipulation between the parties concerning a confidential informant was also admitted as a court exhibit. Both sides rested, and counsel for each party argued orally, on May 9, 2012. I now recommend that the following findings of fact be adopted and that Hale's motion be denied and Moustrouphis' motion be granted in part.

1

## I.  Proposed Findings of Fact

On August 15, 2011, a confidential informant (CI) known to Special Agent Paul Wolf of the Drug Enforcement Agency ("DEA") told Wolf that the CI would be able to purchase crack cocaine from a person known to him as "A," from whom the CI had previously purchased crack cocaine.  This CI had a history of addiction and drug use, with relapses continuing into the time period involved in this case.  The CI had a criminal history.  The CI had been compensated for fruitful information in the past, and was paid $500 in connection with the information provided in this case.

Wolf had finished another, unrelated investigation with this CI in July 2011.  The CI had periods of dormancy in his relationship with Wolf.  Payment for drug-related information was not this CI's major source of income.  Street price for crack cocaine at that time was from $200 to $300 for 3.5 grams (an "eight ball").  Wolf hoped to get two eight balls.

Wolf asked the CI to contact A to arrange for a delivery of $400 worth of crack cocaine the following day.  The CI described A as white, with a slim build.  The CI said that A had a suspended driver's license.  The CI said that he or she had, more than once, met a person from New York who was the head of the group providing the crack cocaine to A.  New York is frequently a source of illicit drugs that come into Maine.  The CI had met A at the Shaw's supermarket at Westgate in Portland to make prior purchases.

On August 16, 2011, the CI came to the DEA office around noon to make the call, which Wolf monitored but which was not recorded.  Wolf did not record the call because he wanted to arrest A for driving with a suspended license without revealing the CI's identity, if possible, and the tape of the call would be subject to discovery if charges were brought against A.  The CI

arranged for A to deliver crack cocaine in about an hour at the Shaw's parking lot, which was across the street from the DEA office.

Wolf set up surveillance in the parking lot and took the CI to the scene in a vehicle with tinted windows, so that the CI could not be seen by anyone outside the vehicle. He hoped to find crack cocaine in A's vehicle after arresting him for driving on a suspended license. The CI engaged in a series of telephone calls with A that updated the CI about exactly when A would arrive. A informed the CI that he would arrive in a small gray car.

At around 1:30 p.m., a gray Honda arrived in the Shaw's parking lot and parked. Wolf could see that the driver was a white male in his 20s and the passenger seat was occupied by a black male. Using binoculars, the CI identified the driver as A, but said that he or she did not recognize the passenger.[1] Wolf directed the other agents to block the Honda and detain its occupants. They did so.

Wolf and DEA Special Agent Brian Tully opened the passenger door. Defendant Hale was seated in the front passenger seat. Hale complied with all of the agents' requests. He got out of the car and was placed in handcuffs. Wolf could smell marijuana inside the Honda when the door was opened. Joshua Guay, a Scarborough police officer assigned to the Maine Drug Enforcement Agency task force, and another task force agent removed defendant Moustrouphis from the driver's seat and placed him in handcuffs. Guay also noted a strong odor of unburned

---

[1] At oral argument, counsel for Hale made much of his assertion that before the confidential source was taken from the area of the parking lot where the stop occurred, he or she was asked if the black man who was the passenger was the source of supply from New York, and was provided with binoculars to look at him. He or she said it was not. Counsel contended that *United States v. Di Re*, 332 U.S. 581 (1948), holds that once the confidential source says that a person whose mere presence at the scene is not the source, that the government's interest in that person ends. That argument expands *Di Re* far beyond any reasonable construction of the opinion's language. In that case, the informer pointed out only one person as a "guilty party," and the Supreme Court held that the defendant's presence in the car in which the crime took place, without more, did not provide probable cause allowing the officers who arrested the "guilty party" to search the defendant. *Id*. at 587, 593-94. However, the opinion does not suggest that, once an informant has failed to identify an individual as known to the informant to be involved in the crime at issue, the officers must not seek out more information about that individual, but rather must let him walk away. In addition, the fact that Hale was not identified as the source of the crack cocaine that the CI had been purchasing does not mean that he was not involved in some other way in the sale and/or delivery of that illicit drug.

marijuana. In the process of removing the defendants from the Honda, Wolf became aware that in a recess behind the passenger side interior door handle there was a baggie containing less than one ounce of marijuana.

The driver refused to give Guay his name or address, or to produce his driver's license. Guay asked his dispatcher to check on the registration of the gray Honda. He was informed that the Honda was registered to Maria Moustrouphis with an address on Memory Lane in South Portland. She was approximately 20 years older than the driver appeared to be. The officers learned that Maria had a son named Alex who was about the same age as the driver appeared to be, and that his arrest record described a distinctive tattoo on his neck. The driver of the Honda had the same tattoo. The jail sent Wolf a photograph of Alex Moustrouphis, and when Wolf held it up next to the driver, it was the same person. Guay then confirmed that Alex Moustrouphis's driver's license was under suspension.

Defendant Moustrouphis was then arrested for driving with a suspended license. He was searched, and no drugs were found. Wolf conveyed Moustrouphis to the Cumberland County Jail, where he hoped that the strip search conducted by jail personnel might reveal the crack cocaine that had been the object of the operation. During the transport and after arriving at the jail, Wolf made many telephone calls seeking a K-9 unit with a drug-detecting dog. No drugs were found on Moustrouphis's person. Wolf arranged for the South Portland Police Department K-9 unit to come to the Shaw's parking lot.

After Moustrouphis was taken from the scene of the arrest, defendant Hale's handcuffs were removed, some 15 to 20 minutes after they had been put on. He had been cooperative to that point, giving Tully his name when asked, and telling him that he was from New York City and had been staying with Moustrouphis for the past few days. He told Tully that he had just

been ready to smoke a marijuana cigarette when the car was stopped. When asked, he said that there was more marijuana in the car and that it was his.

When the handcuffs were removed, Hale was told for a second time that he was not under arrest but was not free to leave. When Wolf arrived back at the Shaw's parking lot from the jail, the dog and its handler, Sergeant Corbett of the South Portland Police Department, were already at the scene. Corbett informed the other officers that the dog had located a marijuana "roach" on the ground outside the front passenger door of the car. Guay began to fill out a civil summons for possession of marijuana for Hale.[2] Hale was still being detained at this time because Moustrouphis did not have the expected crack cocaine, and none was found in the car, so he might be carrying it. The drug dog had earlier found a second, larger marijuana "roach" in the door to the back seat on the driver's side of the car, but no other drugs.

Corbett informed the other officers that he had found a firearm in the car. Guay looked at the gun before it was moved; he had to put his head into the front passenger footwell and look up and toward the center of the dashboard. The handgun was behind the radio, on an axis perpendicular to that of the car, with the grip uppermost. It was removed and put into an evidence bag after it was determined that there was no round in the chamber but there was a full magazine in the gun. At this point Hale was handcuffed again.

Wolf left shortly thereafter with two or three other agents to continue the investigation at Moustrouphis's residence. Guay ran a criminal history check on Hale and a check on the gun, determining that Hale had at least one felony drug conviction and that the gun had not been reported stolen. Some 30 to 40 minutes after Hale had been handcuffed for the second time, Guay searched Hale. The dog from South Portland could not be used to search people, due to its

---

[2] Later, at the Cumberland County Jail, Hale refused to sign the summons. When Guay learned that Hale was being prosecuted in federal court, he decided not to pursue the summons.

aggressive nature.  Hale was wearing jogging pants, and when Guay ran his hand under the waistband of the pants, a clear plastic bag containing about 6 grams of crack cocaine fell onto the ground.  Hale was then arrested and transported to the Cumberland County Jail.

When he arrived at 45 Memory Lane, a single family home, Wolf went to the front door and knocked.  There was no response.  There were no cars in the driveway.  There were children's toys in the back yard.  Wolf spoke to neighbors who were outside their own houses, and he was told that Alex Moustrouphis lived in the house with his mother, Maria, and his sister, Elizabeth; that Maria lived in the house on weekends and worked in New York during the week; that a toddler lived at the house with Elizabeth on a part-time basis; and that Alex Moustrouphis had left the house within the past hour with a black man whom they did not know.  Wolf obtained telephone numbers for Maria and Elizabeth from the neighbors.

Wolf tried the number for Maria, but there was no answer.  He then called Elizabeth, and told her of his concern that guns or drugs or other people who might be dangerous might be in the house.  Elizabeth said that Maria owned the house.  She was cooperative and concerned about the welfare of her child.  She conferenced Maria into the call, and they both gave Wolf verbal consent to search the residence.  Elizabeth volunteered to come home with a key to let the agents in.  She arrived 20 minutes later.

Elizabeth opened the back door, and the agents performed a security sweep, finding no one inside the house.  During the sweep, while on the second floor, Wolf noticed three bedroom doors, all of which were open wide enough that he could walk into the bedrooms without having to touch the door.  He returned to the kitchen, filled out a DEA permission-to-search form, and watched Elizabeth sign the form.  He and the other agents then searched the house.

There were children's toys in one of the bedrooms. Another had female clothing hanging in the closet.[3] The smaller third bedroom had a man's clothing and Elizabeth said that Alex used that bedroom. There was no lock on the door. Elizabeth said that she and Alex did not pay rent to Maria and had no lease agreement with her. She said that she had access to all of the rooms in the house; there were no private areas forbidden to others.

The smaller bedroom had a full bed, photographs of Alex Moustrouphis, a dresser, a closet, and a shelving unit with multiple shoeboxes on the shelves. Some of the boxes contained shoes. In one box, Wolf saw two bundles of currency that were attached to a derringer that was loaded and cocked without a safety. He also located a digital scale and what he believed to be a drug ledger in other boxes or on the shelves. In the box with the scale were numerous packages of cocaine. A tennis-ball-size chunk of crack cocaine, approximately 95 grams, was found in the toe of a slipper.

Elizabeth said that Alex spent a lot of time in the garage near the house and that Hale sometimes slept on a couch in the house. The agents searched the trash in the garage and found dozens of sandwich baggies with the corners torn out, которая is the way cocaine is packaged. There was also a receipt showing that money had been sent to Salim Coggins, known to Wolf as a New York-based distributor of cocaine to the Portland area.

---

[3] At oral argument, counsel for Moustrouphis assigned this bedroom to Elizabeth, asserting that there was no indication that the mother lived there for any relevant period of time. To the contrary, the only evidence on point is that Maria lived in the house on weekends, leaving to work in New York during the work week. Indeed, one or more neighbors gave Wolf a telephone number for Maria, information not likely to be shared with neighbors by an absentee owner whose children are the only tenants of the house. It is thus at least equally likely that Elizabeth shared with her child the bedroom in which toys were observed.

## II. Discussion

### A. Hale Motion

Defendant Hale seeks suppression of the cocaine found in the waistband of his pants. Motion to Suppress Evidence ("Hale Motion") (ECF No. 29) at 1. He argues first that the time that elapsed between the stop of the Honda and Guay's discovery of the cocaine makes the search so attenuated that it cannot pass constitutional muster. *Id*. at 4-5. The government does not respond to this argument directly, contending only that probable cause to arrest Hale for conspiracy to distribute and possess with intent to distribute cocaine existed before he was searched, rendering the search constitutionally sound, even though it occurred before Hale was actually arrested. Government's Objection to Defendant's Motion to Suppress ("Hale Opposition") (ECF No. 35) at 4-8.

It is certainly true, as the government contends, *id*. at 6-7, that so long as probable cause to arrest exists before an arrest, other evidence discovered before the arrest need not be suppressed. *United States v. Bizier* 111 F.3d 214, 217 (1st Cir. 1997); *see generally Rawlings v. Kentucky*, 448 U.S. 98, 110 (1980) (where formal arrest followed quickly on heels of search of defendant's person, fact that search preceded arrest not particularly important, so long as police had probable cause to arrest before search of person); *United States v. Smith*, 389 F.3d 944, 950-52 (9th Cir. 2004) (search of passenger area of vehicle before driver arrested upheld). In light of this argument, the defendant drops the primary argument in his initial motion, based on the law applicable to *Terry* stops,[4] Hale Motion at 4-6, and challenges the government's assertion that probable cause to arrest him existed before the cocaine was found. Reply to Government's Objection to Defendant's Motion to Suppress ("Hale Reply") (ECF No. 37) at 2-5.

---

[4] *Terry v. Ohio*, 392 U.S. 1 (1968).

Hale accurately cites *United States v. Di Re*, 332 U.S. at 593, for the proposition that a passenger's mere presence in a vehicle with an offender at the time of that offender's criminal conduct does not alone establish probable cause to arrest the passenger. Hale Reply at 3. However, that is not the only fact upon which the government relies to support its position.

Instead, the government points out that the CI was well known to one or more of the law enforcement officers involved, as was his or her reliability, which was enhanced in this case by the CI's first-person knowledge and the self-incriminating nature of the information the CI provided; that the CI correctly predicted the events that transpired on the afternoon of August 16, 2011; that, when he was first approached, Hale was surrounded by the smell of marijuana and admitted that the marijuana in the car was his; that Hale was from an area known by the agents to be a source of drugs flowing into Maine; that Hale had a criminal history that included drug-related offenses; that a firearm had been found in close proximity to Hale's seat in the car; and that the drugs ordered from A were not in the car or in A's possession. Hale Opposition at 7-8. The government contends that this information, taken as a whole, "would lead a person of reasonable caution to conclude that the defendant had committed a felony prior to the challenged search." *Id*. at 8. The government specifies that felony as conspiring to distribute and possess with intent to distribute cocaine base. *Id*. at 7.[5]

There are problems with the government's construct. The CI never said anything about a second person being involved in the buy. He could not identify Hale. Thus, his credibility is not an issue with respect to the question of probable cause to arrest Hale. The relevant information that the officers had about Hale before he was searched is that he was riding in a car with an individual from whom the CI expected to buy crack cocaine, that there was a concealed handgun

---

[5] At oral argument, the government suggested two additional felony charges as to which probable cause existed at the relevant time: constructive possession of a firearm by a user of a controlled substance, and possession of a firearm in furtherance of a drug trafficking offense. The court need not reach either possibility in this case.

near the seat in which he was riding, that he admitted to ownership of a small amount of marijuana, and that he had a criminal history involving unspecified drug-related offenses. The question is whether this information, in addition to the fact that the cocaine expected to be sold to the CI by A was not in the car or being carried by A, was sufficient to give the agents probable cause to arrest Hale.

It is the latter fact that saves this search with respect to the distribution and possession with intent to distribute charge, if it can be saved at all. While the question is a close one, in the absence of that information, the agents did not have probable cause to arrest Hale for the crime of conspiracy to distribute and possession with intent to distribute crack cocaine. *See, e.g., United States v. Munoz-Villalba*, No. CRIM. 1:05-CR-238, 2005 WL 3050164, at *8 (M.D.Pa. Nov. 15, 2005).

After the car and Moustrouphis had been searched, Hale was the only remaining possible location of the crack cocaine that the CI had arranged to purchase. If he was carrying the cocaine, Hale could be charged as a co-conspirator with Moustrouphis. Under the circumstances, a reasonably cautious person would conclude that Hale had the cocaine. Contrary to the oral argument of Hale's attorney that the government had to show that Hale necessarily had the crack cocaine on his person, all the information that was necessary to establish probable cause to make the search of Hale valid under the circumstances of this case was present. After all,

> [p]robable cause exists when police officers, relying on reasonably trustworthy facts and circumstances, have information upon which a reasonably prudent person would believe the suspect had committed or was committing a crime. The inquiry into probable cause focuses on what the officer knew at the time of the arrest, and should evaluate the totality of the circumstances. Probable cause is a common sense, nontechnical conception that deals with the factual and practical

>considerations of everyday life on which reasonable and prudent men, not legal technicians, act.

*United States v. Vongkaysone*, 434 F.3d 68, 73-74 (1st Cir. 2006) (citations and internal punctuation omitted). An officer's determination that a crime has been committed need not be "highly probable"; it need only have been "reasonable" to satisfy the standard of probable cause. *United States v. Winchenbach*, 197 F.3d 548, 555-56 (1st Cir. 1999).

The government's alternative contention, that the agents had probable cause to arrest Hale for possession of marijuana before he was searched, Hale Opposition at 8-9, is also persuasive. Hale dismisses this argument by noting that possession of the amount of marijuana at issue here is a civil violation under Maine law, not a criminal offense, so that there would have been no basis for an arrest in Hale's admission that he owned the marijuana. Hale Reply at 5.[6] However, the government's argument is that Hale could have been arrested on a federal charge. As the government points out, marijuana is a Schedule I controlled substance listed in 21 U.S.C. § 812, and possession of any amount is a violation of 21 U.S.C. § 844(a). Hale Opposition at 8. The agents had probable cause to arrest Hale for possession of marijuana before he was searched, immediately preceding his arrest, making the search acceptable as one incident to arrest. *See Duncan v. Fapso*, 216 Fed. Appx. 588, 590, 2007 WL 528860, at **2 (7th Cir. 2007).

The government's alternative argument provides sufficient basis to deny Hale's motion to suppress, regardless of the outcome of its first argument.

---

[6] Hale also points out that "the officers both did not intend to and did not arrest Hale over the marijuana." Hale Reply at 5. Neither fact affects the probable cause analysis. *Devenpeck v. Alford*, 543 U.S. 146, 153-54 (2004) (officer's subjective reason for making arrest need not be criminal offense as to which known facts provide probable cause).

11

### B.  Moustrouphis Motion

Defendant Moustrouphis seeks to suppress the evidence found in his bedroom and the gun found in the car that he was driving on August 16, 2011.  Defendant Alex Moustrouphis' Motion to Suppress ("Moustrouphis Motion") (ECF No. 48) at 1.[7]  Specifically, he contends that the agents did not have probable cause to believe that the gray car contained contraband or evidence of criminal activity (as to the gun), and that neither his mother nor his sister gave valid consent to search his bedroom.  *Id*. at [1]-[3].

The argument concerning the gun fails.  On the evidence presented at hearing, the agents clearly had probable cause to search the car.  The CI had arranged to meet A, the driver of the car, at the location where the car stopped at or near the appointed time, in order to buy crack cocaine from him.  After Moustrouphis, whom the CI identified as A, had been patted down, and after he had been searched at the jail, and the promised cocaine was not found, the agents had every reason to search the car, including the fact that the drug dog had alerted on the exterior and interior of the car.  *United States v. Lopez*, 380 F.3d 538, 544-45 (1st Cir. 2004); *United States v. Marenghi*, 896 F. Supp. 207, 214 (D. Me. 1995).

The remainder of Moustrouphis' motion requires more extensive discussion.  Consent to a search obviates the need for a search warrant.  *United States v. Franklin*, 630 F.3d 53, 59-60 (1st Cir. 2011).  Valid consent to search may be given by a third party with common authority over the premises.  *Georgia v. Randolph*, 547 U.S. 103, 106 (2006).  There can be no question that both Maria and Elizabeth, residents of the house, had common authority over the premises with Moustrouphis, who had no lease with and paid no rent to his mother.  *See United States v. DiPrima*, 472 F.2d 550, 551 (1st Cir. 1973) (fact that defendant paid mother $10 weekly for board and lodging did not prevent her from consenting to search of his bedroom).  They clearly

---

[7] The motion does not extend to the evidence found in the garage at the house in which Moustrouphis resided.

used the property along with Moustrouphis and had joint access or control, so that it is reasonable to recognize that each of them had the right to permit the inspection in her own right. *United States v. Hyson*, 721 F.2d 856, 859 (1st Cir. 1983). Moustrouphis assumed the risk that his mother or his sister might permit the house to be searched. *Id*.

     Moustrouphis contends, however, that this common authority extends only to the common spaces of the house and not to his "separate bedroom." Moustrouphis Motion at [2]. He cites no authority in support of this distinction. The government responded at oral argument that the door to the bedroom was open and had no lock, and that Elizabeth told Wolf that she had access to that room whenever she wished. This case is distinguishable from those in which consent to enter a defendant's bedroom cannot be given by a third party. In *United States v. Jiménez*, 419 F.3d 34 (1st Cir. 2005), a case cited by Moustrouphis' attorney in oral argument, the consent to search was given by the lessee of the premises, but the door to the defendant's bedroom was closed and locked, the lessee did not have a key to the lock, she told police before they entered the bedroom that she was not supposed to enter it, and she forced the lock open with a knife. *Id*. at 38-40. These are the facts that the First Circuit found significant in holding that consent to search the defendant's bedroom could not be given by the lessee; each is essentially the opposite of the facts in the case at hand. On the showing made, the consent to search given by Elizabeth was valid and included the defendant's bedroom.

     At oral argument, Moustrouphis' attorney added an argument not present in his motion; he filed no reply to the government's opposition to his motion. The new argument is that, even if valid consent to search his bedroom was given, it did not extend to the shoeboxes on the shelves

in the room and the slipper that was somewhere in the room.[8] Counsel maintained that opening the boxes or feeling the large chunk of crack cocaine when moving some bedroom slippers were "no different than if he had a briefcase that was sitting on a desk," and that "[i]t is a different inquiry whether you have consent to search that separate briefcase or suitcase as opposed to the room itself." He cited no authority in support of this argument. Counsel for the government did not object to the new argument as untimely, nor did he ask for time in which to submit a response.

The First Circuit has stated that "a person generally has an expectation of privacy in items he places in a closed container," *United States v. Meada*, 408 F.3d 14, 22-23 (1st Cir. 2005) (also noting that consent to search an apartment does not necessarily authorize search of closed containers within apartment), and this expectation is not forfeited when the closed contained is located in a place that is not controlled exclusively by the container's owner. *United States v. Davis*, 332 F.3d 1163, 1167 (9th Cir. 2003). The consent issue, therefore, is not whether Elizabeth and/or Maria had joint access to or mutual use of Moustrouphis' bedroom, but rather whether they had such access to or shared control of the closed shoeboxes. *Id*. at 1169. The government offered no evidence on this point.

I cannot, however, deem a slipper to be a "closed container." Even if that construction were possible, however, a closed container that "betray[s] its contents" even while closed is not protected by the expectation of privacy inherent in a closed container. *Meada*, 408 F.3d at 23. Wolf found the cocaine after he felt something hard in the toe of a slipper that he was moving out of the way. That slipper, to the extent that it was a container, had not been "opened" and

---

[8] Counsel for Moustrouphis stated that the testimony was that the slipper was on a shelf. The testimony of agent Wolf, who was the only witness who testified about the search of the house, did not specify the location of the slipper in the room.

certainly betrayed its contents at that point, even if it could possibly have been considered "closed."

Accordingly, the motion to suppress should be granted only as to the contents of the closed shoe boxes in Moustrouphis' bedroom and otherwise denied.

### III.  Conclusion

For the foregoing reasons, I recommend that the proposed findings of fact be adopted, defendant Hale's motion to suppress (ECF No. 29) be **DENIED**, and defendant Moustrouphis's motion to suppress (ECF No. 48) be **GRANTED** as to the contents of any covered shoe box found in Moustrouphis' bedroom at 45 Memory Lane, South Portland, Maine, and otherwise **DENIED.**

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days after being served with a copy thereof.  A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 30th day of May, 2012.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge